IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **INDEPENDENCE RESTAURANT GROUP D/B/A/ INDEPENDENCE BEER GARDEN on behalf of itself and All others similarly situated,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-2365 |
| | : | |
| **CERTAIN UNDERWRITERS AT LLOYD'S, LONDON** | : | |
| *Defendant.* | : | |

# MEMORANDUM

Aside from its devastating impact on the health and lives of people across the globe, the COVID-19 pandemic has also wreaked havoc on the livelihoods of business owners and employees. Plaintiff Independence Restaurant Group brings this putative class action suit, on behalf of itself and others similarly situated, seeking a declaratory judgment that its continuing business losses caused by COVID-19 and related government orders are covered under its insurance policy with Certain Underwriters at Lloyd's, London.

## I. BACKGROUND[1]

---

[1] The Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). The Court draws the following facts from the First Amended Complaint, the insurance policy that is the basis for the plaintiff's claims, and the government orders the parties reference in their pleadings and have filed as supplements to the record. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court includes Independence's well-pleaded factual allegations as they pertain to the discussion but

1

Plaintiff IRG owns and operates Independence Beer Garden, a restaurant/beer garden on Independence Mall in Philadelphia, Pennsylvania. Plaintiff's Amended Complaint ("Compl."), ECF No. 25, ¶¶ 10, 49. IRG alleges that it has been unable to operate its business as a result of governmental orders and/or the COVID-19 pandemic. *Id.* ¶¶ 44, 50. Because of the virus and related government orders, its business has remained closed for an extended period of time and, since reopening, IRG has been required to comply with income-losing restrictions and capacity limitations. *Id.* ¶ 48. –

According to the Complaint, the virus that causes COVID-19 (the "coronavirus") remains stable in airborne aerosols for up to three hours, on certain surfaces for between four hours and three days, and on surfaces of objects as "formites" for up to 28 days. *Id.* ¶¶ 32, 34. Individuals who have been infected may be asymptomatic, and the droplets that carry the coronavirus are not visible to the naked eye. *Id.* ¶¶ 35-36. A property contaminated by the coronavirus would require cleaning, disinfecting, and remediating the surfaces of personal property in the insured premises. *Id.* ¶ 30. Plaintiff's business has a "heightened risk of the property becoming contaminated, requiring constant sanitation and cleaning to avoid the spread of the COVID-19 virus." *Id.* ¶ 45, 49, 51.

When the coronavirus began spreading in Pennsylvania, the Commonwealth and City of Philadelphia restricted activities of individuals and businesses in the state. These orders included Pennsylvania Governor Wolf's March 19, 2020, order that all restaurants

---

notes many of the allegations in the complaint are either legal assertions or conclusory statements. Such allegations are generally not included here except as necessary for context. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789-90 (3d Cir. 2016).

and bars must suspend dine-in services statewide. *See* Order of the Governor of the Commonwealth of Pennsylvania regarding the Closure of All Businesses that are not Life Sustaining, (Mar. 19, 2020). Pennsylvania also issued a stay at home order, restricting bars and restaurants to dine-out service only. Compl. ¶ 42.

IRG alleges that the government orders mandated a statewide closure of "all non-life sustaining[] businesses including businesses owned and operated by Plaintiff." *Id.* ¶ 40.[2] IRG also alleges that it was unable to operate its business because of the government's orders, *id.* ¶¶ 39-44, and that it was "physically restrained from operating its business." *Id.* ¶ 27. IRG also alleges that it has been unable to use its property for its intended purpose or has been limited in the use of its property. *Id.* ¶ 50.

IRG had an insurance policy with Lloyd's from August 14, 2019, until August 14, 2020, and has faithfully paid its premiums. *Id.* ¶ 12, 16. IRG's insurance policy is an "all risk" policy, which provides coverage for all covered causes of loss unless a cause of loss is specifically excluded or limited in the policy. *Id.* ¶ 18. The general insuring clause of the policy provides that Lloyd's "will pay for direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting

---

[2] The plain language of the government orders, however, suggest otherwise. They specify that "[b]usinesses that offer carry-out, delivery, and drive-through food and beverage service may continue" but "restaurants and bars [are] ordered to close their dine-in facilities to help stop the spread of COVID-19." *Id.* The associated list of life-sustaining businesses includes restaurants for take-out only. *See* ECF No. 29, Ex. E. At oral argument, IRG added the allegation that IRG is an outdoor dining-only establishment that does not do takeout. Oral Argument Transcript at 14-15. IRG also supplemented the record with a government order showing that outdoor dining had been prohibited before June 12. *See* ECF No. 45, City of Philadelphia Amendment Regarding Outdoor Dining to the Emergency Order Allowing Limited Reopening of Businesses, June 16, 2020. Therefore, according to IRG, the orders mandated a closure of its outdoor-dining only business.

from any Covered Cause of Loss." Policy, ECF No. 29, Ex. A, Form CP 00 10 04 02, at

p.1 of 14). "Covered Cause of Loss," in turn, is defined as "Risks of Direct Physical Loss

unless the Loss is" otherwise excluded or limited. *Id.* Form CP 10 30 04 02, at p. 1 of 9.

The Policy also provides for business income coverage. The Business Income

provision states, in part, that Lloyd's:

> "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be *caused by direct physical loss of or damage to property at premises which are described in the Declarations* . . . The loss or damage must be caused by or result from a Covered Cause of Loss. . ."

*Id.* Form CP 00 10 04 02, at p. 1 of 9 (emphasis added).[3]

The terms "suspension," "operations," and "period of restoration" are defined in

the Policy. "Suspension" means, in part, the "slowdown or cessation of your business

activities." *Id.* Form CP 00 30 04 02, at p. 9 of 9. "Operations" means, in part, "your

business activities occurring at the described premises." *Id,* at p. 8 of 9. And "period of

restoration" is defined, in part, as the period of time beginning "72 hours after the time of

direct physical loss or damage for Business Income Coverage . . . caused by or resulting

from any Covered Cause of Loss at the described premises" and ending on the earlier of

the date (1) when the property "should be repaired, rebuilt, or replaced with reasonable

speed and similar quality" or (2) "[t]he date when business is resumed at a new

permanent location." *Id.* Form CP 10 04 02, at p. 9 of 9.

---

[3] The Policy also provides "Extra Expense" coverage. "Extra Expense" is defined as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." *Id.* Form CP 00 30 04 02, p. 1 of 9.

4

Separately, the Policy provides for "Civil Authority Coverage." Under this provision, Lloyds:

> "[W]ill pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins."

*Id.* Form CP 00 30 04 02, p.2 of 9.

As potentially relevant here, the Policy also contains a microorganism exclusion and two pollution exclusions that exclude coverage for otherwise covered losses. *See* Form LMA 5018, at p. 1 of 2; *id.* Form CP 10 30 04 02, at p. 3 of 9.

IRG timely submitted a claim for business income and related losses under its insurance policy on March 31, alleging losses arising from the COVID-19 pandemic and government orders. Compl. ¶ 14. Six weeks later, IRG filed the instant action. The complaint alleges that Lloyd's has failed to provide coverage under the Policy and has told Plaintiff's counsel that coverage does not exist. *Id.* It seeks declaratory relief on behalf of itself and other businesses in Pennsylvania that are insured by Lloyd's under similar policies and that have also suffered business losses from the COVID-19 pandemic or the government orders. *Id.* ¶ 59. It asks the Court to declare that the COVID-19 pandemic and the government orders trigger coverage under the Policy and that the Policy provides coverage to IRG and the class members for any current, future and continued business interruptions stemming from the COVID-19 pandemic. *Id.* ¶ 74.

## II. PROCEDURAL HISTORY

IRG filed suit on behalf of itself and a putative class on May 20, 2020. ECF No. 1. Lloyd's moved to dismiss, ECF No. 23, and IRG then amended its complaint, ECF No. 25. Lloyd's then moved to dismiss the amended complaint, ECF No. 29. After that motion was fully briefed, the Court held oral argument on November 12, 2020. Defendant's motion and all accompanying briefs, record supplements, and notices of record are now before the Court for resolution.

## III.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Twombly*, 550 U.S. 544, 558 (2007) (requiring "some specificity in pleading before allowing a potentially massive factual controversy to proceed") (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983)).

The Court must conduct a three-step analysis when presented with a 12(b)(6) motion. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675) (alterations in original). "Second, it should identify allegations that,

because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *id.* at 679) (internal quotation marks omitted). Third, if "there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* (quoting *id.*).

## IV. DISCUSSION

### A. Legal Framework

The issue before the Court is one of contract interpretation. Under Pennsylvania law, which the parties do not dispute applies to this case, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. Ct. 2005)).

The Court's analysis begins with whether a provision in the insurance policy is ambiguous. When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005). "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (quoting *401 Fourth St.*, 879

7

A.2d at 170) (internal quotation marks omitted).[4] A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (1986)). Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.* at 607.

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Cas. Co. v. Estate of Mehlman*, 598 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Once that burden is met, the insurance company "bears the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

### B. Prima Facie Coverage

In its motion to dismiss, Lloyd's argues that IRG has not and cannot show its claim falls within the Policy's grant of coverage. IRG responds that it has sufficiently alleged facts that, under its reasonable interpretation of the Policy, trigger coverage or at minimum allow it to proceed past the motion to dismiss stage.

#### 1. Business Income Coverage

---

[4] Because the policy at issue was drafted by one party and only signed by the other, it is also an adhesion contract. Under the doctrine of *contra proferentem*, "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) ((citing *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) (citing Restatement (Second) of Contracts § 206))).

Under the Business Income Coverage provision, Lloyds agreed to provide for business income losses due to the necessary "suspension" of "operations" during the "period of restoration." The "suspension must be caused by direct physical loss of or damage to property," and that "loss or damage must be caused by or result from a Covered Cause of Loss," defined as "Risks of Direct Physical Loss" unless otherwise limited or excluded. *See* Policy, Form CP 00 10 04 02, at p. 1 of 9; *id.* Form CP 10 30 04 02, p. 1 of 9. So, for IRG to be eligible for business income loss coverage, there must be direct physical loss of or damage to its property and that direct physical loss or damage must have caused the slowdown or cessation of its business activities. IRG alleges that the COVID-19 pandemic and the government closure orders caused it to suffer physical loss of or damage to its property, while Lloyd's argues that IRG's allegations do not constitute "direct physical loss of or damage" within the plain meaning of the Policy.

The parties' dispute comes down to the meaning of "direct physical loss of . . . property" and whether IRG has sufficiently alleged such loss. IRG argues that "direct physical loss of" must have a different meaning than "direct physical . . . damage to" property. IRG believes its proffered meaning, that "direct physical loss of . . . property" means "direct physical *loss of use of* . . . property," is reasonable and must govern because Lloyd's failed to define the term in the Policy. Under that reading, it argues, its loss of use of its restaurant, loss of the property's functionality as a restaurant, and loss of use for the property's intended purpose – all arising from the onset of a physical virus and caused by the virus and/or the government orders – would trigger coverage. Lloyd's responds that "direct physical loss" does not and cannot mean mere "loss of use."

9

Rather, "direct physical loss of or damage to" property requires either a physical alteration of the property or its complete destruction, and neither are present in this case.

Third Circuit precedent is on point and instructive here. In *Port Authority of New York and New Jersey*, the Circuit addressed whether the presence of asbestos in a building constituted "direct physical loss or damage" under New Jersey law. *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002). The Court explained that "[i]n ordinary parlance and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure." *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)). But damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building." *Id.* at 235. Recognizing that the policy at hand also covered "physical loss," the Court concluded that the "proper standard for 'physical loss or damage' is one that triggers coverage:

> "only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its *function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable,* or if there exists an *imminent threat* of the release of a quantity of asbestos fibers that would cause such *loss of utility*."

*Id.* at 236 (emphasis added). The criteria for 'physical loss' caused by a source "unnoticeable to the naked eye" is thus "whether the functionality of the . . . property was nearly eliminated or destroyed, or whether the[] property was made useless or uninhabitable" by that source. A panel of the Third Circuit has explained that this test is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F.

10

App'x 823, 826 (3d Cir. 2005) (finding an issue of material fact existed as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

Upon review of the Policy, Third Circuit caselaw, cases cited by the parties from across the country, and the Court's own independent research, the Court agrees with the court's conclusion in *4431, Inc. et al v. Cincinnati* that, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." *4431, Inc. et al v. Cincinnati Ins. Cos.*, No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original). There must also be an "element correlating to [the] extent of operational utility – *i.e.,* a premises must be uninhabitable and unusable, or nearly as such." *Id; see also Brian Handel D.M.D. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways).[5]

This conclusion is not only consistent with Third Circuit precedent but is mandated by canons of interpretation as applied to this Policy. Under Pennsylvania law, an insurance policy "must be read as a whole and construed in accordance with the plain

---

[5] Thus, *structural* damage is not required to show "direct physical loss of" property. But the source that destroys or nearly destroys the property's utility must have something to do with the physical condition of the premises.

11

meaning of terms." *Am. Auto Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (citing *C.H. Heiste Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981)). Under a mere "loss of use of . . . property" definition, any near-elimination or destruction or any uselessness or uninhabitability, regardless of the source that caused such loss of utility, would be a covered "direct physical loss." But reading the Policy to cover mere loss of use untethered to any physical condition of the property would render two other Policy provisions superfluous or nonsensical.

First, allowing mere loss of use to constitute direct physical loss of property would create discord between the "physical loss of or damage to" requirement and the Civil Authority Coverage provision. For example, if a government order barring access to a premises or mandating its closure could create a "direct physical loss" triggering business income coverage because it "nearly eliminated or destroyed" the property's functionality or rendered it uninhabitable, there would be no need for a separate Civil Authority provision granting coverage where civil authority orders bar access to premises under more limited circumstances.

Second, the Policy only provides Business Income Coverage during the "Period of Restoration." That period exists only until the earlier of "[t]he date when the property at the described premises should be *repaired, rebuilt, or replaced* with reasonable speed and similar quality" or "[t]he date when business is resumed at a new permanent location." Policy, *supra*, Form CP 00 30 04 02, at p. 8 (emphasis added). Built into coverage for business income losses, then, is the idea that there must be something to "repair[], rebuild, or replace[]" – none of which exists for mere loss of use untethered to a physical

12

condition affecting the property. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it.").

This Court accordingly adopts the test the Court in *4331, Inc.*, gleaned from Third Circuit precedent.[6] And so the Court looks to IRG's complaint to determine whether well-pleaded facts show alleged losses that "bear some causal connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." *4431, Inc.*, 2020 WL 7075318, at *10. IRG alleges that it suffered "a complete deprivation of use, access, presence and operation" of its property, that it was "physically restrained and prohibited from operating the property," and that it has been limited in its use of its property and unable to use it for its intended purpose. *See* Compl. ¶¶ 27, 50. Its losses are allegedly caused by the government orders and the COVID-19 pandemic. *Id.* ¶ 14. It alleges that the virus is invisible, can remain in the air for three hours, and on surfaces for days. *Id.* ¶¶ 32, 34. Its property is allegedly at high risk of contamination if not already contaminated, and IRG must regularly clean and sanitize the property to minimize potential for its transmission. *Id.* ¶ 49.

---

6 This conclusion is also consistent with a leading insurance treatise, which explains that "[t]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10 Couch on Ins. § 148:46 (3d ed. 1998); *cf. id.* (recognizing that the opposite result has been reached when a property was rendered uninhabitable by gasoline vapors, so the threatened physical damage to the property triggers the insurance company's obligation to undertake expense to safeguard the property).

These are not covered losses within the meaning of the Policy. With respect to the government orders, even assuming they had rendered IRG's property uninhabitable or nearly eliminated or destroyed its function, loss of use caused by government orders cannot constitute "direct physical loss of . . . property" for the reasons described. IRG also alleges that its property is at imminent threat of being contaminated by the virus.[7] But those allegations also do not meet the requisite threshold. While IRG alleges that it has suffered a complete loss of its property's functionality and use, other allegations show that neither the virus itself nor any imminent threat of its presence has "nearly eliminated or destroyed" its functionality or rendered it "useless or uninhabitable." *Hardinger*, 131 F. App'x at 826-27. Rather, IRG's business reopened (albeit with restrictions and limited capacity) once the government orders lifted, Compl. ¶ 48, showing that the government orders addressing the virus rather than the virus itself was the source seriously affecting the property's functionality. Second, by IRG's admission, contaminated surfaces can be cleaned and sanitized. *Id.* ¶ 30. Therefore, actual contamination by the virus would not meet the requirements under *Port Authority* because presence of the virus would not render the property useless or uninhabitable or nearly eliminate or destroy its functionality.

---

[7] To the extent that the Complaint suggests the virus is already on Plaintiff's property, IRG's brief does not press that argument. *Compare* Compl. ¶ 49 ("There exists an ongoing risk that the property is or may be contaminated") *with* Br. in Opp. at 29, n. 15 (arguing there is "no evidence of record" that IRG's property was contaminated by the virus). In any event, actual contamination would not trigger coverage under the following analysis.

Nor would coverage for actual or threatened coronavirus contamination make sense in connection with the Period of Restoration language, which ties business income coverage eligibility to the period during which the property can be "repaired, rebuilt, or replaced." When asked about this provision at oral argument, plaintiff's counsel explained that IRG had to "move equipment around, add Plexiglass, [and] do other things to restore the property and make it functional and reasonably safe for patrons." Tr. at 20. Even so, none of those activities can reasonably be described as repairing, rebuilding, or replacing. Neither can disinfecting or cleaning property that is contaminated.[8]

As a final effort, IRG also argues that its losses are covered because the Policy does not include a virus exclusion present in some other property insurance policies. But "[a] loss which does not properly fall within the coverage clause cannot be regarded as covered thereby merely because it is not within any of the specific exceptions . . ." *Port Auth.*, 311 F.3d at 234 (quoting 10 Couch on Ins. 148:48 (3d ed. 1998)). And it is at least plausible that the physical manifestation of some type of virus could cause covered losses. That situation is just not present here.

The Court recognizes that some courts in other jurisdictions over the last few months have either found coverage under similar policies or allowed cases to survive motions to dismiss. But upon review of those non-binding cases, the Policy itself, and

---

[8] Similarly, even if IRG's allegations of physical *damage* could be construed as non-conclusory, they would not suffice. Neither the government orders nor actual or imminent contamination meets the "higher threshold" for property damage from unseen sources because surfaces could be disinfected and contamination would not eliminate the function of the building or its elements, and because there is nothing to repair, rebuild, or replace. *Port Auth.*, 311 F.3d at 235.

relevant Third Circuit caselaw, the Court believes the course it adopts today is the correct one. Accordingly, IRG has not met its burden to show prima facie coverage under the Business Income Coverage provision.[9]

### 2. Civil Authority Coverage

IRG also alleges that its business losses are covered under the Policy's Civil Authority Coverage provision. For that provision to apply, there must be an "action of civil authority that prohibits access to [Plaintiff's] premises due to direct physical loss of or damage to property, other than at [Plaintiff's] premises, caused by or resulting from any Covered Cause of Loss." Policy, *supra*, Form CP 00 30 04 02, p. 2 of 9. In other words, IRG must allege that a civil order prohibited access to its property due to physical loss of or damage to other property caused by a risk of direct physical loss.

Lloyd's argues that IRG's complaint does not allege such loss or damage and that access to its property was not prohibited because of such loss or damage. IRG argues the government prohibited the public from the premises of its restaurant, that the primary purpose of the government orders was to "mitigate and ultimately stop the spread of property loss already caused by COVID-19," and that it sufficiently alleged damage to property in and around IRG's property. Br. in Opp. at 19. The Court agrees with Lloyd's that there is no coverage under the Civil Authority Coverage provision.

---

[9] Because IRG has not suffered "direct physical loss of or damage to" its property, Extra Expense coverage, premised on the same "direct physical loss of or damage to" requirement, is also not warranted.

First, the government orders did not "prohibit[] access to the described premises." IRG alleges that it meets this requirement because the public was barred from its premises. But neither IRG, its employees, nor the public was barred from the premises. The government orders did not prohibit IRG from accessing the property to provide takeout, and, while orders barred the public from *dining* at the premises and, for a time, from ordering to-go food inside the premises, the public was never barred from accessing the premises to pick-up food. *See* Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus (Mar. 22, 2020), https://www.phila.gov/media/20200322130746/Order-2-Business-And-Congregation-Prohibition-Stay-At-Home.pdf. The allegation that IRG does not offer takeout has no bearing on whether "access" to the "premises" was "prohibited" by government order. Rather, IRG's allegations fail to distinguish "between [its] place of business (*i.e.,* the physical premises where they operate their business), and the business itself." *Pappy's Barber Shops, Inc. v. Farmers Grp.* No. 20-cv-907, 2020 WL 5500221, at *6 (S.D. Ca. Sept. 11, 2020).[10] In any event, IRG has not plausibly pleaded the necessary physical loss of or damage to other property as required under the Civil Authority provision. IRG has

---

[10] Plaintiff cites *Narricot Industries* for the proposition that prohibition on operating a facility constitutes a "prohibition of access" under Pennsylvania law. *See Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. 01-4679, 2002 WL 31247972 (E.D. Pa. 2002). But that case is distinguishable. While two industrial plants were ordered not to operate, the city also prohibited access to the road that led to one plant, and prohibited road travel to all but emergency personnel around the other. *Id.* at 1-2. Because individuals could not travel on roads that led to the facilities, there was a prohibition on access not present here.

17

not alleged any specific "direct physical loss of or damage to" nearby property, and general allegations that the coronavirus is present nearby does not mean nearby property suffered "direct physical loss" or "damage" as those terms apply in the Policy.

For the above reasons, IRG has failed to meet its burden to show prima facie coverage under its insurance policy. Therefore, the Court will not shift the burden to Lloyd's to determine whether an exclusion precludes coverage where it otherwise exists.

### C. Leave to Amend

Courts must grant plaintiffs leave to amend their complaint where justice so requires. Fed. R. Civ. P. 15(a)(2). But where leave to amend would be futile, denial of leave to amend is appropriate. *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007). The Court will not grant IRG leave to amend its complaint because IRG can allege no facts related to its Policy, its losses, or the reasons for its losses that could bring its claim within the coverage of its insurance policy.

### V. CONCLUSION

For the foregoing reasons, IRG is not entitled to coverage for the losses it suffered. Its claim for declaratory relief will accordingly be dismissed with prejudice as to IRG and without prejudice as to the putative class.